## PINCKNEY v. INGLESBY.

1. The Circuit decree directed that the complaint be dismissed. On appeal by plaintiff no question was made by defendant as to the correctness of one of the conclusions of law upon which the decree was based. *Held*, that such conclusion would be accepted by this court as the law of this case.

2. Four owners in common of a steam dredge agreed that it should be sold for them by a trustee, but not without the consent of all. All consented to a sale, the consent of one being given by an agent, who was himself the purchaser. Before knowledge and ratification by the absent principal of this act of his agent, one of the other owners, on learning who the purchaser was, withdrew his assent. *Held*, that an agent to sell cannot become the purchaser, and therefore there was no consent by the absent principal until ratification by him.

3. *Held, further*, that the consent of another owner might be withdrawn by him at any time before such ratification, which could not relate back so as to interfere with rights intermediately vested.

Before HUDSON, J., Charleston, March, 1887.

The opinion fully states the case.

*Messrs. Hayne & Ficken*, for appellant, cited *Story Agency*, §§ 210, 241, 242; 18 *Wall*, 338; 42 *Am. Dec.*, 616; *Paley Agency*, §§ 345–347; *Pom. Eq. Jur.*, §§ 1079, 218, 956, 959; 2 *Sugd. Vend.*, 406; 4 *How.*, 554; 6 *Ves.*, 617, 627; 10 *Ibid.*, 381; 1 *Hill Ch.*, 354; *Story Eq. Jur.*, §§ 218, 308, 322, 323; 9 *Hare*, 534; 4 *Kent*. 371, note *c*; 27 *S. C.*, 53; *Hill Trust*, 537; 6 *Pick.*, 204; 14 *N. Y.*, 91.

*Mr. Theodore G. Barker*, contra, cited *Story Agency*, §§ 464–

470; 1 *Pars. Cont.*, 49; 3 *Kent*, 151–155; 2 *Ves. & B.*, 242; 2 *Rose*, 78; 1 *Mont. Part.*, 102; 4 *Johns. Ch.*, 526; 22 *Pick.*, 48; *Freem. Cot.*, §§ 164, 168; *Pom. Eq. Jur.*, §§ 854, 856, 901–903; 2 *Bro. Ch.*, 400; *Story Agency*, § 211.

March 28, 1888. The opinion of the court was delivered by

Mr. Chief Justice Simpson. The plaintiff, appellant, the Charleston Mining and Manufacturing Company; Wyllie & Gordon, and Drayton & Company, who were engaged in mining phosphate rock, purchased certain dredges that lately had belonged to the Marine River Phosphate Company, and had been used in mining rock in the beds of the rivers of this State, at the sum of $25,000. The object of the purchase was to withdraw these dredges from mining operations, until there should be an increased demand for phosphate rock. The parties named above joined in said purchase as follows, to wit, the Charleston Mining and Manufacturing Company two fifths and the other three one-fifth each. The property was conveyed by consent of all parties to the respondent, Charles Inglesby, in trust for said parties, who, on October 11, 1884, executed a declaration of trust, purporting to be between the said Charles Inglesby and the other parties, in which it was stipulated, among other things, that the said Inglesby was to hold and keep the said dredges for the said other parties, "taking such action with reference to the preservation, care, charge, conduct, management, leasing, working, sale, or other disposition of the said property, or any part thereof, and of the proceeds, income, and usufruct, as may be directed by the said owners, or by the instructions of three-fifths in value of said owners, and upon being so directed shall make and execute from time to time such lease or leases, bill or bills of sale, or other assurances or writings as may be proper and necessary to carry into effect the wishes of the said owners, or a majority of them, in value so expressed as aforesaid," &c.

This declaration of trust was duly recorded, but it seems that at the time of its execution the appellant, Pinckney, was absent in New York, and he did not sign it personally, though it was signed for him by Edward F. Witsell. The other parties signed as follows: The Charleston M. & M. Co., by Joseph A. Yates,

superintendent; Wyllie & Gordon, by Mr. D. Roberts, respondent, and by Charles Inglesby personally. Wyllie & Gordon, it seems, were absentees, and were represented in all these matters by D. Roberts, as their agent and attorney. The master, to whom this case was referred, found as matter of fact, that while the appellant, Pinckney, was fully informed that these dredges had been conveyed to Charles Inglesby, to be held by him in trust for the purchasers, yet he had no knowledge of the declaration of trust executed by him, in which the stipulation as to the sale by instructions of three-fifths was incorporated.

Some time after this the purchasers, for reasons satisfactory to themselves, concluded to sell the dredges, and Inglesby, the trustee, was authorized to negotiate a sale. The property, in the mean time, had become much depreciated from injuries resulting from the cyclone which passed over Charleston in 1885. As the result of these negotiations, Mr. Inglesby received a bid of $8,000 for the dredges then unsold from D. Roberts. This bid was communicated to all of the parties, or their agents, and among them, to Mr. Pinckney in New York. The bid was made by Mr. Roberts on December 28, 1885, with instructions to Mr. Inglesby, however, not to give his name, no reason being assigned for this, except that it was Mr. Roberts' usual method of negotiations. On December 29, 1885, Mr. Inglesby wrote to Mr. Pinckney, telling him that a reliable offer of $8,000 cash had been made, and that he was satisfied that the party would not give more. On December 30, 1885, Mr. Pinckney, without asking the name of bidder, replied by letter : "Accepts the offer of $8,000, * * * so far as his interest is concerned." On December 31, 1885, Drayton & Company accepted the offer. And on December 31, 1885, Mr. Yates, representing the Charleston Mining and Manufacturing Company, accepted by telegram said offer ; and Mr. Roberts, respondent, accepted for Wyllie & Gordon.

On January 4 or 5, 1886, a paper, which had been prepared to consolidate for record the consent of the co-owners to the sale, was presented to Mr. Pinckney, who, then finding for the first time that Mr. Roberts was the purchaser, declined to sign it. Mr. Roberts, however, had paid in the purchase money, perhaps

on January 2.   On January 6 and 7 the shares of said money belonging to the Charleston Mining and Manufacturing Company and Drayton & Company were paid to them, and January 8 that of Mr. Pinckney was tendered to him, who declined to receive it; and on January 9 that of Wyllie & Gordon was paid to Mr. Roberts.   On January 9, 1886, Mr. Pinckney wrote to Mr. Inglesby that when his consent to the sale was given he was ignorant of the fact that the bidder was Mr. Roberts, who was present at all of the consultations of the owners, and he requested that his consent be considered as withdrawn.   Inglesby replied that he was too late, the sale having been consummated on December 31 preceding.

Under these circumstances the action below was commenced by Mr. Pinckney against Inglesby and Roberts, in which Pinckney demanded judgment for a partition of the property between himself and the said Roberts, or for a sale and an accounting for rents and profits, &c., &c.   The case was referred to the master, who, in an elaborate report, found, with many other facts not material here, the substance of the statement made herein above. He also found as matters of law :   1. That Inglesby's power to sell was limited to a sale of the entire interest of all the co-owners, and that while each owner might sell his own interest, yet that Inglesby could only sell all by the consent of all.   2. That inasmuch as Pinckney consented to the proposed sale on December 30, 1885, and the other owners consented on December 31, 1885, Pinckney became bound, unless he is not bound by his consent for some reason other than that his co-owners had not consented.   3. That the relation existing between Pinckney and Wyllie & Gordon, and between Pinckney and Roberts, was not of a confidential character, such as rendered it necessary that the name of Roberts as purchaser should have been communicated to Pinckney, or such as authorthized Pinckney to withdraw his consent to the sale.

His honor, Judge Hudson, who heard the case, confirmed the report of the master and dismissed the complaint with costs. From this decree Mr. Pinckney has appealed upon the exceptions below, to wit:

GROUNDS OF APPEAL.—"1. Because the evidence established

that Wyllie & Gordon did not know of Roberts' offer for the purchase of the dredges, and did not ratify and confirm the proposed sale to him, mentioned in the pleadings, until after plaintiff had withdrawn his consent to such proposed sale; and the master in his report therefore erred, and the presiding judge, in confirming that report, also erred, in holding that all the co-owners had consented to said proposed sale on December 31, 1885, and plaintiff became, on the day last named, absolutely bound by the consent he had given on December 30, 1885.

"2. Because the master, in his report, erred, and the presiding judge, in confirming that report, also erred, in holding that Roberts did not occupy such relation to plaintiff and the other co-owners (except Wyllie & Gordon), as is recognized by the law as 'confidential,' and as incapacitating him from purchasing said dredges from or through Inglesby, except under the restraints which govern the purchase of property by agents, trustees, or other persons who, by being employed or concerned in the affairs of another, have acquired, or had the opportunity of acquiring, a knowledge of such property.

"3. Because the master, in his report, erred, and the presiding judge, in confirming that report, also erred, in holding that Roberts did not occupy such relation to Inglesby and Pinckney as gave to Pinckney a legal right, recognized in a Court of Equity, to expect that when an offer for the purchase of the dredges was made to Inglesby, he (Inglesby) would, before concluding the bargain, receive from Roberts, as well as from each of the several co-owners, 'a sincere and honest opinion, *unbiassed by conflicting interests,*' as to the expediency of accepting such offer.

"4. Because the master, in his report, erred, and the presiding judge, in confirming that report, also erred, in not holding that inasmuch as Inglesby acted under instructions from Roberts in not communicating Roberts' name as the proposed purchaser when he communicated the offer of $8,000 to the owners of the dredges, Pinckney had a legal right, recognized in a Court of Equity, to withdraw his consent to the proposed sale, given in ignorance of that fact.

"5. Because, inasmuch as the exclusive right to manage and

conduct all negotiations for the sale of the dredges had been confided to Inglesby ; and Roberts had acquired, or had opportunities for acquiring, information concerning the property not possessed by strangers who might desire to purchase, by having consulted freely and confidentially with the co-owners as to the terms, mode of sale, and so forth ; the master in his report erred, and the presiding judge, in confirming that report, also erred, in not holding that, according to the well settled policy of the law, the character of the relation between plaintiff and defendants in respect to a sale of the dredges by and through Inglesby was one of such trust and confidence as is recognized in a Court of Equity as entitling Pinckney to withdraw his consent, given in ignorance of the fact that Roberts was the proposed purchaser, and that Inglesby, in submitting the offer to Pinckney, had (under instructions from Roberts) withheld Roberts' name.

"6. Because the master, in his report, erred in not holding that Pinckney had a right to withdraw his consent when he did, and was not absolutely bound by his previous acceptance of the offer submitted to him by Inglesby. And the presiding judge also erred in confirming that report and in dismissing the complaint."

The master found, as matter of law, that inasmuch as Pinckney, the appellant, had no knowledge of the declaration of trust, in which the stipulation as to the power of three-fifths interests controlling the disposition of the property was incorporated, that Inglesby, the trustee, could not sell the entire property, except with the consent of all of the co-owners. This finding was affirmed by his honor, the Circuit Judge, without appeal or contest ; it must, therefore, be regarded as a ruling and established principle in the case.

This being so, the first question presented is, did all of the co-owners, including Pinckney, give their consent to such sale ? This question precedes the other questions raised as to whether Pinckney was entitled to know the name of the purchaser, and whether said purchaser occupied such a relation towards him as forbade his buying the property. This question would at first seem to be a question of fact, and subject to the general rule, that the finding below, concurred in by both the master and the

trial judge, would require a very strong contra showing to over-turn it. But when more closely examined it involves a question of law as well as one of fact. No doubt, as a matter of fact, that the Charleston Mining and Manufacturing Company accepted the bid, also Drayton & Company, also Wyllie & Gordon, through their agent, Roberts, who was the purchaser; and also Pinck-ney, at one time, who afterwards withdrew his acceptance. Now, Pinckney claims that Roberts, agent of Wyllie & Gordon, could not legally accept for them his own bid as purchaser, and that before Wyllie & Gordon had accepted for themselves, or had rati-fied the acceptance of Roberts, he had withdrawn his acceptance. These facts seem to be admitted, to wit : when Pinckney with-drew his acceptance there had been no acceptance by Wyllie & Gordon, except by Roberts, the agent; nor had there been any ratification by Wyllie & Gordon of Roberts' action.

Now, the question of law arises upon these facts : was the acceptance of Roberts for Wyllie & Gordon binding upon them, so that it was true, as matter of fact, that the sale of Inglesby was made by the consent of all of the co-owners, and, therefore, binding upon all, as was held by the master and affirmed by the Circuit Judge ? Roberts was the acknowledged agent of Wyllie & Gordon (who lived abroad) in all the matters connected with these dredges. Roberts represented Wyllie & Gordon as one of the vendors of the property, and we suppose that it is hardly necessary to refer to authority to support the proposition that, as between them and Roberts, any purchase made by Roberts for himself would be void. The master says, upon this subject, "that if Wyllie & Gordon had objected to the purchase by Roberts, when they knew of it, the sale, of course, could not have stood for a moment." We concur in this view. The acceptance, then, of Roberts for Wyllie & Gordon, under the circumstances, was not the acceptance of Wyllie & Gordon ; nor were they in any way bound by it. At the time of the sale, therefore, the matter stood as if one of the parties, at least, had not authorized it. And the trustee not having the power to sell the entire interest, except by the consent of all, his sale was pre-mature and invalid, except so far as it might be ratified subse-quently. No doubt, if all the parties had come in afterwards

and ratified said sale, the purchaser, Roberts, would have become entitled to the entire interests. But if any one of said parties declined to ratify, his interests, at least, would not have passed. At the sale all but Wyllie & Gordon had legally accepted. This, however, as we have said, did not authorize Inglesby to proceed; his authority was conditioned upon the direction of all—not a part. The sale, therefore, did not bind Pinckney. And before Wyllie & Gordon were heard from directly Pinckney had withdrawn his consent.

The next question is, did the ratification of the sale by Wyllie & Gordon, after Pinckney had withdrawn his consent, react to the sale and legalize it upon the theory that the subsequent ratification was consent at the time of the sale, thus complying with the required condition that all of the co-owners should be found consenting at that time? There are some important qualifications to the doctrine of ratification as to its effect. It cannot interfere with or defeat "the rights of parties which have intervened between the act and the ratification." "The party ratifying should be able, not merely to do the act ratified at the time the act was done, but also at the time the ratification was made." "The act of ratification must take place at a time, and under circumstances, when the ratifying party might himself have lawfully done the act which he ratifies." *Cook* v. *Tullis*, 18 *Wall.*, 338; *Bird* v. *Brown*, 4 *Exch.*, 786; *Story on Agency*, §§ 241, 242.

No doubt that Wyllie & Gordon could have given their consent after the sale as well as before as to their interests, and had they given it before the sale, the consent of all would have been present; but before the sale was ratified by them, if at all, Pinckney had withdrawn his consent, and therefore at that time, to wit, at the time of ratification, they could not unite with the other co-owners in authorizing the sale. In other words, it was necessary for all to unite in order to authorize the sale. Had Wyllie & Gordon consented before the sale, this required union would have been accomplished, as all of the others had consented. But after the sale, and before Wyllie & Gordon had ratified by giving their consent, Pinckney had withdrawn; therefore Wyllie & Gordon were not able to do at their ratification what they could

have done at the sale, to wit, have legalized Inglesby's authority to sell, by uniting with the other co-owners in directing it.   Our conclusion thus far demanding, as it does, a reversal of the judgment below, it would encumber this opinion unnecessarily to consider the other questions raised in appellant's exceptions.

It is the judgment of this court, that the judgment of the Circuit Court be reversed, and that the case be remanded for such further proceeding as may be necessary.